**Carl Post, OSB No. 061058**
carlpost@lawofficeofdanielsnyder.com
**John Burgess, OSB No. 106498**
johnburgess@lawofficeofdanielsnyder.com
LAW OFFICES OF DANIEL SNYDER
1000 S.W. Broadway, Suite 2400
Portland, Oregon 97205
Telephone: (503) 241-3617
Facsimile: (503) 241-2249

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**DISTRICT OF OREGON**
**PENDLETON DIVISION**

| | |
|---|---|
| **JASON REINHARDT**, | Case No. 2:24-cv-1220 |
| Plaintiff, | **COMPLAINT** |
| v. | |
| **STATE OF OREGON; WARREN ROBERTS; THOMAS BRISTOL;** and **DOES 1-10**, | Jury Trial Demanded |
| Defendants. | |

### NATURE OF ACTION

1.      This is a civil rights action brought pursuant to 42 U.S.C. § 1983 and Or. Rev. Stat. § 30.260 to redress Defendants' negligence and deliberate indifference to Plaintiff's serious medical needs.

PAGE 1 – COMPLAINT

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over Plaintiff's claims of violation of federal constitutional rights pursuant to 28 U.S.C. §§ 1331(a) and 1343 because the causes of action arise under 42 U.S.C. § 1983. This Court has jurisdiction over Plaintiff's supplemental state law claims under 28 U.S.C. § 1367.

3. Venue is proper in the District of Oregon pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District of Oregon and because Defendants are subject to personal jurisdiction in the District of Oregon.

## TORT CLAIM NOTICE

4. Prior to the institution of this action, Plaintiff provided notice of this claim to all necessary parties pursuant to ORS 30.275.

## PARTIES

5. Plaintiff Jason Reinhardt is a citizen of the United States of America. At the time of filing of this action, Plaintiff has standing as he is in custody of the Oregon Department of Corrections (ODOC) at Two Rivers Correctional Institution (TRCI).

6. Defendant State of Oregon operates Oregon Department of Corrections (ODOC) which is an agency of the State of Oregon. ODOC owns and operates correctional facilities in Oregon, including TRCI and is responsible for the inmates in its facilities.

7. Defendant Warren Roberts was employed as the Chief Director of Medical Services for the Oregon Department of Corrections and is located in the Health Services Division, 3723 Fairview Industrial Drive, SE, Salem, OR 97302. Defendant is being sued in his individual and official capacity.

8.      Defendant Thomas Bristol was at all times relevant a physician at ODOC medical services at TRCI and is sued in his individual capacity. At all relevant times, Bristol acted under color of law.

9.      Defendants Does 1-10 were employees of the State of Oregon and worked at TRCI, acting under color of state law. Defendants are sued in their individual capacity. Plaintiff will amend the complaint once the identity of the additional defendants is discovered.

10.     The individually named Defendants were at relevant times employees of ODOC at all times relevant to this complaint. At all times relevant herein each Defendant acted under color of state law and within the course and scope of their employment. Each Defendant is sued individually, for purposes of damages, and in his or her official capacity for purposes of injunctive relief.

**GENERAL ALLEGATIONS**

11.     Inmates in Oregon state prisons must obtain approval from a Therapeutic Level oF Care (TLC) Committee to receive everything from fish oil supplements to pain relief medications to medical scans needed to diagnose and provide adequate medical care. Oregon TLC Committees frequently deny requests for care that are erroneously not considered "medically necessary" or life-threatening, leaving inmates in serious and excruciating pain with untreated medical conditions lasting months or even years.

12.     Incredibly, many of these critical decisions are made by a single person: Defendant Dr. Warren Roberts, chief of medicine for the Oregon prison system. Though the TLC is ostensibly a committee, members typically present cases to Defendant Roberts, who solely determines whether an inmate is worthy or unworthy of treatment. Indeed, Defendant Roberts has explicitly defied judicial rulings demanding that inmates receive medical care.

13. The DOC divides requests for health care into several categories, or Levels of Care. The first two categories—Level 1 and Level 2—are considered "medically necessary." Generally, prisoners with medically necessary conditions receive some form of treatment, explained Gulick in his deposition.

14. But how the Oregon prison system defines "medically necessary" is not the same as how it is defined by other medical institutions. While treatment for conditions such as diabetes is considered medically necessary, there are a host of other painful but not immediately life-threatening conditions that do not meet that stringent bar. Those conditions often fall into a category called Level 3, treatments for which <u>are considered</u> "medically acceptable but not medically necessary."[1]

15. It's a different system from how health care works elsewhere. If a person was not incarcerated and received general medical care in the community, they would receive medical care in instances that are routinely denied by the TLC Committee.

16. The TLC Committees decide whether prisoners can leave the prison to receive health care at an outside location, such as a hospital. This determination, and the way the state of Oregon tracks it, reveals what the state sees as a major priority for prison health care: the budget, not the well-being of inmates. The state tracks how often prisoners receive outside health care as a "key performance measure." The goal, according to a 2022 publication by Oregon's Legislative Policy and Research Office,[2] is to keep the percentage of offsite care cases below 1 percent. In other words, offsite care is not determined by medical need, instead medically necessary treatment is routinely denied to keep the budget as low as possible and

---

[1] https://olis.oregonlegislature.gov/liz/2021I1/Downloads/CommitteeMeetingDocument/256726

[2] https://olis.oregonlegislature.gov/liz/2021I1/Downloads/CommitteeMeetingDocument/256743

meet the arbitrary "key performance measure."

17. The word "committee" in TLC Committee is a bit of a misnomer. Even though multiple people meet for the committee meetings, the decisions are ultimately made by Dr. Roberts alone. Instead of acting as a true committee, the TLC members present cases to Defendant Roberts and he decides whether to approve or deny treatment.

18. That arrangement wasn't unique to Defendant Roberts. The previous medical director, Daniel Dewsnup, also made unilateral decisions after hearing from the committee members.

19. On April 3, 2023, around 9:15 pm, Plaintiff was setting up weights for a workout with his partner. He was doing an incline bench press and lifting 135 pounds. He was doing warmups. He went to rack the weight and thought he had racked both sides. He let go of the bar and the left side was not racked properly and the bar fell onto the left side of his face. He both heard and felt crunching. He was able to get out from under the weight. He went into the day room where TRCI staff took him from the institution to the Emergency Room at Good Shepherd Medical Center in Hermiston, Oregon.

20. The following is a photo of Plaintiff taken at Good Sheperd on April 3, 2023:



PAGE 5 – COMPLAINT

21. While at the emergency room, he was seen by Dr. John Elliott. He received pain management and a CT scan was done. They diagnosed Plaintiff with a traumatic head injury, fractured nose, fractured upper and lower orbital socket, fractured temple, fractured cheek, and an acute left zygomaticomaxillary complex fracture. Dr. Elliott said Plaintiff should be followed up in a trauma clinic within a week. He recommended contacting the clinic, at 503-224-1371, the next day to set up an appointment. The doctor asked the deputies if they would get Plaintiff to Portland for treatment, and they didn't really respond.

22. On April 4, 2023, Plaintiff was discharged in the early morning from Good Shepherd Medical Center back to TRCI. The after-visit summary stated to set an appointment with a specialist, Ashish A Patel, MD, DDS, within a week. Ashish Patel, MD, DDS specialty is Oral & Maxillofacial Surgery. After being discharged, Plaintiff was taken to the Medical Infirmary Area 1 at TRCI.

23. On April 4, 2023, Nurse Practitioner Patrick Maney requested approval for Plaintiff to see Dr. Patel for an assessment and treatment. Defendant Roberts and the ODOC TLC Committee denied the proposed treatment despite knowing it was medically necessary and that failure to provide timely treatment from a qualified specialist would result in increased risk of harm and increased pain and suffering by Plaintiff. Instead, Plaintiff was referred to Dr. Richard A. Flaiz, MD FACS in Hermiston, Oregon, despite knowing that Dr. Flaiz was not qualified to provide medical care for Plaintiff's injuries.

24. On April 8, 2023, at 5:30 in the morning, Plaintiff woke up with new symptoms and had double vision, no peripheral vision, and his left eye was in severe pain.

25. On April 19, 2023, Plaintiff was completely titrated off Norco for pain management by medical staff. Plaintiff did not request to be titrated off the prescription

medication to help with pain management and was now receiving 400mg of Ibuprofen every eight hours for pain.

26. On April 20, 2023, at approximately 11-11:15am, Dr. Paul Vitt came to see Plaintiff and he brought a nurse along with him. At this point, Plaintiff had had no assessments done by any Nurse Practitioner or doctor at TRCI, or anyone outside the institution, other than his emergency room visit on April 3, 2023. Dr. Vitt checked Plaintiff's vision. Plaintiff expressed his concerns with his constant headaches, pain in his left temple and eye socket, double vision, blurred vision, light sensitivity, tremors, difficulty breathing through his nose, and lethargy. Plaintiff asked Dr. Vitt to document everything and Dr. Vitt took offense to that.

27. On April 20, 2023, at approximately 1:45 pm, Plaintiff spoke to the nurse and asked if the Ibuprofen dose he was currently taking (400mg every eight hours) could be increased to help with pain management. Plaintiff was told sometime later that Dr. Vitt denied the increase in Ibuprofen.

28. On April 21, 2023, Plaintiff was told by Nurse Bradshaw that the surgery he needed was outside of Dr. Flaiz's practice. Nurse Bradshaw told Plaintiff that he would be able to receive 400mg of Ibuprofen along with 650mg of Acetaminophen every 6 hours now for pain management.

29. On April 25, 2023, nurses came into the medical area and took photos of Plaintiff's face and said they were again taking his case to TLC.

30. On April 26, 2023, at approximately 11am, Patrick Maney, AGNP (Nurse Practitioner) at TRCI, came to see Plaintiff and brought 3 nurses with him. Plaintiff discussed his headaches, pain in his left temple and eye socket, double vision, blurred vision, light sensitivity, tremors, difficulty breathing through his nose, and lethargy. After the examination,

PAGE 7 – COMPLAINT

Patrick Maney said that Plaintiff needed to be seen by Dr. Evers, the eye doctor at TRCI.

31. During the afternoon of April 26, 2023, Plaintiff was taken to see Dr. Evers inside TRCI and received an eye exam. Plaintiff's eyes were dilated, and his vision issues were addressed. Plaintiff's left eye was not tracking properly, and his loss of peripheral vision, double vision, blurred vision, light sensitivity, pain in eye socket and temple were discussed. Dr. Evers said he would work with Patrick Maney because he believed if the bones in his eye socket were fixed his vision may improve. Dr. Evers gave permission for Plaintiff to be able to wear sunglasses indoors and outdoors for approximately three weeks due to his light sensitivity.

32. On May 1, 2023, Patrick Maney came to check on Plaintiff. He approved for Plaintiff to receive 50mg of Tramadol every six hours for six days, along with continuing 400mg of Ibuprofen and 650mg of Acetaminophen for pain management.

33. On May 4, 2023, Plaintiff was taken to see Dr. Bart Adams, an Ophthalmologist at East Oregon Eye Center in Pendleton, Oregon. Dr. Adams said that Plaintiff needed to be seen by an Orbital Surgeon, and that he believed there may be nerves or muscles in the eye that were being pinched.

34. On May 9, 2023, Plaintiff was taken to be seen by Dr. Matthew Black, a Maxillofacial Surgeon at the Columbia Basin Oral & Maxillofacial Surgeons Office in Kennewick, Washington. He discussed surgery and overall concerns with Plaintiff's vision issues. Despite Dr. Black noting the 5-week delay since injury and that the surgery needed to be completed as soon as possible, ODOC categorized Dr. Black's orders as "No Urgent Needs."

35. On May 16, 2023, Plaintiff had surgery at Kadlec Regional Medical Center with Dr. Matthew Black, DDS. Because Defendants denied Plaintiff timely medical care, Dr. Black had to rebreak the bones in Plaintiff's face, which was more painful than the original

accident. Dr. Black said that his vision will most likely not come back because of the delayed surgery.

36. On May 17, 2023, Plaintiff returned from Kadlec to TRCI.

37. On May 22, 2023, Plaintiff was seen by Maney, NP.

38. On May 25, 2023, Plaintiff returned to the clinic for a follow-up regarding a continued blurred vision on the left side and some loss of peripheral vision.

39. On May 31, 2023, a post-op follow-up appointment with Dr. Black at Columbia Basin was approved, along with a recommendation for Dr. Evers to evaluate vision concerns.

40. On June 5, 2023, Plaintiff was seen by Dr. Maney and it was recommended that he have a neurology consultation and brain MRI due to zygomatic fractures and continuing problems with tremors and balance.

41. As of June 11, 2023, Plaintiff's post-surgery symptoms, 68 days post injury, included mental fogginess, lacking balance, continued tremors, difficulty breathing, and left-eye pain.

42. On June 15, 2023, Plaintiff was seen for a post-op examination by the surgeon.

43. On June 26, 2023, Defendant Roberts and the TLC Committee denied ENT and Neurology consultations for Plaintiff despite knowing they were medically necessary.

44. On July 19, 2023, Defendant Roberts and the TLC Committee again denied ENT and Neurology consultations for Plaintiff despite knowing they were medically necessary.

45. On October 21, 2023, Defendant Roberts and the TLC Committee denied an ENT consultation for Plaintiff despite knowing it was medically necessary.

46. On November 8, 2023, Defendant Bristol and Defendant Roberts denied Plaintiff's request for an ENT consultation despite knowing it was medically necessary.

47. The TLC Committee and Defendants Bristol and Roberts knew of and disregarded the ongoing risk to Plaintiff's health, ignored his ongoing symptoms, and instead continued the same treatment despite the obvious and ongoing failure to resolve Plaintiff's conditions.

48. Plaintiff needs to be seen by a neurologist and ENT specialist. However, Defendants continue to deny this medical care despite knowing it is medically necessary to resolve Plaintiff's conditions and that failure to provide this care creates ongoing and increased risk to Plaintiff's health.

49. Defendant State of Oregon has and continues to refuse to provide Plaintiff with adequate and needed medical care for his ongoing medical conditions and symptoms suffered as a result of the incident on April 3, 2023.

50. Plaintiff has exhausted his remedies under the PLRA. Additionally, on September 22, 2023 Plaintiff submitted notice of tort with the Oregon Department of Administrative Services as required by ORS 30.275 as well as providing additional notice on October 4, 2023 and by filing this lawsuit.

## FIRST CLAIM FOR RELIEF

## 42 USC 1983 – Eighth Amendment

### Against individual defendants

51. Plaintiff re-alleges all prior relevant paragraphs as if fully set forth herein.

52. The Eighth Amendments impose a duty on jail officials to provide humane conditions of confinement, including adequate medical and mental health care and protection from harm and threats to an inmate's safety and security. Defendants Roberts and Bristol knew of Plaintiff's need for medical care and refused to provide it as alleged above.

53. Defendants knew Plaintiff would suffer serious harm if they failed to properly monitor him or provide appropriate medical care. Defendants were deliberately indifferent to Plaintiff's health, safety, serious medical needs, and other constitutional rights by failing to provide treatment as alleged above.

54. As a result of defendants' deliberate indifference, Plaintiff endured and suffered severe physical and emotional distress and suffered a preventable injury. The estate is entitled to economic and noneconomic damages in an amount to be determined at trial.

55. Defendants have shown reckless and callous disregard and indifference to inmates rights and safety and are therefore subject to an award of punitive damages to deter such conduct in the future.

56. Plaintiff is entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988.

## SECOND CLAIM FOR RELIEF

### (Negligence)

### (against Defendant State of Oregon)

57. Plaintiff re-alleges and incorporates all prior relevant paragraphs.

58. The risk of harm to Plaintiff was foreseeable to the Defendant.

59. Defendant State of Oregon, by and through its employees or agents, including but not limited to employees named as defendants in this Complaint, were negligent, as alleged above, in their treatment of Plaintiff in that they failed to provide timely and appropriate medical care, and failed to use the degree of care, skill, and diligence used by ordinarily careful health providers practicing in the same or similar circumstances in the same or similar community.

60. As a direct result of the actions and inactions of defendant State of Oregon,

Plaintiff endured and suffered severe physical and emotional distress and suffered a preventable injury.

## PRAYER FOR RELIEF

Plaintiff prays that this Court will enter a Judgment against Defendants granting Plaintiff:

A. Economic and noneconomic damages against Defendants in an amount to be determined at trial;

B. Punitive damages against the individual defendants in a sum that is just as determined by a jury;

C. Equitable relief;

D. Plaintiff's costs, expenses, and attorney fees in this suit; and

E. Any additional relief this court deems just, proper, and equitable.

## JURY DEMAND

Plaintiff demands a trial by Jury.

Dated: July 29, 2024

**Law Offices of Daniel Snyder**

*s/ Carl Post*
Carl Post, OSB No. 06105
carlpost@lawofficeofdanielsnyder.com
John David Burgess, OSB 106498
johnburgess@lawofficeofdanielsnyder.com
Tel: (503) 241-3617 / Fax: (503) 241-2249
Attorneys for Plaintiff